### 32631. ATLANTIC COAST LINE RAILROAD CO.
### *v.* SINGLETARY, administratrix.

DECIDED OCTOBER 7, 1949. REHEARING DENIED NOVEMBER 1, 1949.

*Alston, Foster, Sibley & Miller, Philip H. Alston Jr., William B. Spann Jr.,* for plaintiff in error.

*T. J. Lewis, R. M. Maxwell,* contra.

FELTON, J. The evidence necessary for a determination of the issues in the case is substantially as follows: The train involved was pulled by Engine No. 1805 and left Florence, S. C. for Charleston about midday November 8, 1947, destination Savannah. The deceased was riding as head brakeman. He sat behind the fireman on the left side of the engine. The fireman's name was Jeffords and the engineer's was Johnston. The Santee River bridge is about sixty miles from Florence. The bridge is an old one, crossed by a single track. The fireman testified that he had been employed by the Atlantic Coast Line Railroad Company for almost seven years and that series 1800 engines, of which No. 1805 was one, had been in use during the entire time of his employment. The duties of a head brakeman were to check cars for hot boxes by looking backward out of the engine and also to look forward for any trouble and to watch the signal boards ahead. The approach to the Santee River bridge goes into a single track about a mile before the bridge is reached. Nothing unusual occurred before the train reached the single track. After the train entered the single track the fireman looked out of the window and noticed an object which flew outward and downward from the side of the engine immediately ahead of and below him. This was at a point about half way between the beginning of the single track and the bridge. The fireman did not definitely identify the object but believed it to be the grease cellar. He described the object as being about two feet long and ten inches wide. He also saw a second object fly off which he believed to be the trailer-box cover. He called deceased's attention to the two objects and discussed with him what should be done about it. They determined that the engineer should be advised and the fireman started to cross to the engineer's side of the engine, went back and took another look and then went over and advised the engineer that something was coming off the journal box on the engine. The fireman last recalled that the deceased was sitting on the seat box looking out of the window and at that time they had not reached the bridge. He reported to the engineer and said he had better stop and in-

vestigate. The engineer then stopped the train after it passed over the bridge. After the train had passed over the bridge he returned to his seat to again look at the journal box. At that time he noticed that the deceased had been struck and his head crushed. The exact position of his body after crossing the bridge varies under the varying testimony of the witnesses, but that is immaterial. The engineer and fireman examined the trailer-truck-journal box and found that the cellar-keeper bolt, the cellar, the journal-box cover and three of the four nuts which held the journal-box cover were gone. The cellar-keeper bolt necessarily left the engine prior to the cellar but the two large pieces which the fireman saw fly out were identified by him as the cellar-and journal-box cover and necessarily the three missing nuts which held the journal-box cover must have left the engine with the cover. However, since the fourth nut was in place, it was testified that the journal-box cover must have broken or separated through the hole around this fourth bolt and that there must have been a small triangular piece of metal with sides about two inches long which left the engine separately from the main piece of the cover and which may have left a few moments after the cover itself. The upright girders of the bridge were in line. The first sign of blood or hair was on the seventh upright on the first span of the bridge and the full imprint of the deceased's head appeared on the first upright of the second span. There was no evidence of anything having struck the first six uprights but there was some blood and flesh found on one or two uprights between the seventh upright of the first span and the first upright of the second span. The witnesses testified that there was no mark or sign to indicate that any piece of metal had struck any portion of the bridge. The engineer testified that it would have been impossible for any piece of flying metal leaving the area of the journal box to have flown up and struck deceased directly because of the overhang of the engine cab beyond the actual rail on which the wheel was traveling; that he inspected the engine before he went back across the bridge and saw marks on the edge of the trailer or truck frame, marks such as are made by metal striking metal; that they were on the inside of the engine on the trailer frame and bottom of the trailer-brake cylinder; that he had not noticed any of

these marks on the engine prior to the time they left Florence that day; that they were fresh marks that scarred the heavy paint. The father of the deceased testified that the condition of the engine was serious and could cause the engine to turn over. The deceased's head was crushed in and there was also an injury in the skull behind the right ear. An undertaker testified that there was a perpendicular gash in the skull, a sharp cut clean to the bone, which appeared to be entirely separate from other 'wounds and which was so deep that brains were coming out of the opening; that it did not appear to be such a wound as was caused by coming in contact with a girder or iron upright on the bridge and that it could have been caused by hitting a triangular piece of metal about two inches on the short side and two or two and one-half inches on the long side and about three-eighths of an inch thick; that there was a sharp cut in the lobe of the ear, and that he was not an expert. The local surgeon of the railroad testified that the wounds could have been caused by coming in contact with a girder of the bridge; that the whole crushing lick on the head produced death; that it was all one wound; that the deceased's head could have been knocked back against the window and one blow could have caused the whole thing; that he did not notice any grease on the head. Other evidence not set forth here will be referred to later in the opinion.

■ The question of refusal to grant a nonsuit merges into the general grounds of the motion for a new trial. *Pepper* v. *Flanagan*, 204 *Ga.* 265 (2) (49 S. E. 2d, 525).

■ The court did not err in overruling the motion to dismiss count three. The count set forth a cause of action and did not show on its face that the defendant was not negligent, nor did it show on its face that if the railroad was negligent the negligence was not a contributing proximate cause of the death of the deceased.

■ The railroad contends that the verdict was contrary to the evidence on each and every count. It contends that the evidence did not authorize a finding that the deceased was struck and instantly killed by being struck by a part of the engine which had become detached, before the engine entered the bridge, for the reason that no evidence of the contact of the deceased's

head was found before the seventh girder of the bridge. While this theory may be less probable than others it is not beyond the realm of possibility. It might have been impossible for a flying piece of metal to strike the brakeman while he was in his upright seated position in the cab, still, if he was leaning out of the window to observe the defective part of the engine, a flying part of the engine could have hit him. And it could have been possible for him to have been killed by the flying part and that his position for a while was such that his head was not projected far enough to be struck by a girder, but the motion and sway of the engine could have caused his head to continue to project farther as the train moved along so as to bring it into contact with the seventh girder. However, if the jury decided that the death resulted in one of the three ways shown in the petition and that the negligence of the railroad was in part or in whole the proximate cause thereof, a general verdict would have been authorized without the jury's being required to find exactly which theory was correct.

■ The defendant contends that the verdict on the second count was not authorized. This contention is based on the theory that the second count should be construed to mean that the deceased stuck his head out of the engine before the engine entered the bridge and that therefore he must have been struck by the first girder rather than the seventh. This contention is plausible but not necessarily correct because the deceased could have stuck his head out for a very short distance before entering the bridge and could have moved it further out just before approaching the seventh girder. In the absence of a demurrer the second count is held to cover the latter theory. The railroad concedes that it was negligent in permitting the engine to be operated while parts could become loose and fly off but contends that such negligence was not the proximate cause of the death. The evidence was undisputed that the railroad was negligent in the above respect. It was also undisputed that the deceased's duty was to look out of the window of the engine to look out for hot boxes and other causes of trouble. The defendant contends that in view of the fact that the defects in the engine were discovered several hundred yards before the engine entered the bridge it was not the deceased's duty to stick his head out

of the window when the engine was on the bridge when it was dangerous for him to do so when he should have known of the danger. We cannot agree with this contention. However negligent the deceased may have been, we think that the evidence authorized but one finding, and that is that the deceased was sticking his head out in the discharge of his duty. There is no evidence of any nature to indicate that he did so for any other purpose or that he intended to commit suicide. There is no exception to the amount of the verdict. In fact the brief of the defendant shows that it is of the opinion that the jury reduced the amount found by some amount charged to the negligence of the deceased. At any rate, a verdict for the plaintiff was demanded and the jury fixed the amount. The verdict was authorized on the second count.

■ The railroad contends that the verdict was not authorized on the third count. It construes the third count to be based solely on the insufficient clearance between the tracks and bridge girders. We do not so construe the third count. We think the count shows plainly on its face that the count is based on the defects in the engine as well as the insufficient clearance. The railroad contends that the charge of negligence as to the insufficient clearance is unfounded for the reason that the South Carolina Public Service Commission had issued an order requiring a particular clearance in such cases, and that, although the order expressly did not refer to the bridge in this case because it was built prior to the order, the order nevertheless set up a standard of care in the erection of bridges and that the measurements of the bridge in this case met that standard because it met the requirements of the order. Assuming that the railroad is correct in this contention, and that the jury could not find negligence because of insufficient clearance, the verdict was nevertheless demanded that the negligence of the railroad because of the defective engine was at least in part the proximate cause of the deceased's sticking his head out of the window and getting killed, in that the sticking of his head out of the window was in the discharge of his duty whether the deceased was excited in the emergency or whether he was calm and exercised bad judgment in sticking his head out at all or in sticking it out too far. Whether a verdict was authorized on the second count, as we

have indicated it might be, a verdict was authorized on the third count. In fact, omitting the clearance charge in the third count, counts two and three contain the same cause of action. It is immaterial whether they are brought under the F. E. L. Act or for violation of the Safety Appliance and Boiler Inspection Act.

■ It was not error to refuse to give the request to charge set forth in ground five of the amended motion for the reason that the evidence would not have authorized the jury to find that the death of the decedent was caused solely by the lack of sufficient clearance between the engine and the bridge girders. The defective engine and flying parts were at least one of the proximate causes.

■ The ruling complained of in ground four of the amended motion, if error, was harmless, in the view we take of the case. If the engineer had answered the questions and had stated that the fireman and the deceased were calm it would merely have been cumulative of the fireman's testimony to the same effect. If the witness had stated that the fireman and deceased were excited the evidence would have been harmful to the railroad. It would have authorized the jury to find less negligence on the part of the deceased which would have increased the amount of damages against the defendant.

■ Even if the charge requested, as shown in ground six of the amended motion, is correct and easily understandable, especially insofar as the last sentence is concerned, the refusal to give the charge was harmless to the defendant because the evidence required the finding that the defendant's negligence contributed proximately to the death.

■ The charge complained of in ground seven of the amended motion was harmless to the defendant. There was no evidence authorizing the finding that the deceased's negligence was the sole cause of his death under any of the three counts.

■ The charge complained of in ground eight of the amended motion was not harmful, because even if it was erroneous because sufficient facts appeared to authorize the arrival at a conclusion as to what the deceased was doing at the time of his death, in this case the facts shown demanded the finding that at the time of the deceased's death he was sticking his head out of

the engine window in the performance of his duty, however unwisely it might have been done.

The evidence authorized the verdict. The amended grounds of the motion for a new trial show no error. The court did not err in overruling the motion to dismiss the third count or in overruling the motion for a new trial.

*Judgment affirmed.   Sutton, C. J., and Worrill, J., concur.*